## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID C. WALTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO. 3:2004-255 |
| v. | ) |
| | ) |
| UNITED TELEPHONE COMPANY OF | ) JUDGE GIBSON |
| PENNSYLVANIA, | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on United Telephone Company of Pennsylvania's

(hereinafter "Defendant") Motion for Summary Judgment (Document No. 36). For the reasons stated

herein, the motion will be granted.

## I. Concise Statement of Undisputed Facts[1]

Defendant United Telephone Company of Pennsylvania ["Defendant"] provides telephone and

associated services to residential and business customers in certain areas of Pennsylvania. At all times

relevant to this case, [Defendant] was wholly owned by Sprint Corporation.

---

[1] The Defendant has complied with Local Rule 56.1 (B) by filing what it entitles "Defendant's Statement of Undisputed and Material Facts Pursuant to L.Civ. R. 56.1", but the Plaintiff has not complied with Local Rule 56.1(C) because of his failure to file a responsive concise statement of material facts that "responds to each numbered paragraph in the [Defendant's] Concise Statement of Material Facts...[that admits or denies] whether each fact contained in the [Defendant's] Concise Statement of Material Facts is undisputed and/or material...." L.R. 56.(C)(1). The Plaintiff has also failed to reference the record for the origin of the facts he has proposed as well as file an appendix containing the documents supporting his proposed facts. Therefore, the following facts submitted by the Defendant, and not "specifically denied or otherwise controverted" by the Plaintiff are "deemed admitted" pursuant to Local Rule 56.1(E).

Plaintiff David C. Walter ["Plaintiff"] was born on September 18, 1946 and was fifty-five (55) years old when he was discharged by [Defendant] on September 18, 2001. Plaintiff began working for [Defendant] on February 2, 1970 as an "Installer Repairman." Plaintiff's job title changed several times over the course of his employment with [Defendant]. He became a "lineman" as of May 19, 1975, a "Splicer" as of May 15, 1978, an "outside Facilities Technician" as of August 7, 1988; and finally, a "Cable Splicer" as of December 24, 1995.

Brent Boor [hereinafter "Boor"] became the supervisor of the Bedford, PA facility, where Plaintiff worked, in late November 1996. A Position Questionnaire-[Defendant's] equivalent of a job description-which was approved in 1998, provided that Cable Splicers "must be able to climb poles and ladders, lift ladders, equipment cabinet, cabinet tool bags, [and] manhole covers." Essential elements of the Cable Splicer in the Bedford District were the ability to climb poles and drive trucks. Plaintiff described his understanding of the essential duties of the Cable Splicer job:

Q:   Are those two of the main essential things you have to do?
A:   Right. You have to be able to climb poles because you got to work in right of ways. And drive a heavy truck. That's a heavy truck I needed to work out of.

Throughout the time of Plaintiff's employment, [Defendant] maintained an Accidents-Disciplinary Policy (the "Policy") for dealing with employees who were involved in preventable accidents. For a FIRST OFFENSE, the Policy stated as follows:

When by reasonable standards and following an investigation an accident is judged to be preventable, such employee will receive a "Letter of Warning" as advisement that the record of the accident has become part of his/her file. When the reasonable standards and investigation indicate that an accident was caused by extreme carelessness and/or negligence and/or resulted from the employee's violation of specific company announced rules and regulations, further disciplinary action, up to and including suspension or termination, may result. The letter of warning will be wri tten by the immediate supervisor.   Suspension/termination shall be

2

coordinated through the Manager of Safety, Eastern Group and shall require the approval of the Vice President, Human Resources.

For a SECOND OFFENSE, the Policy states:

Such an employee will be disciplined by being suspended without compensation. The length of suspension will be determined by examining the nature and circumstances of the second offense, be related to the nature and circumstances of the first preventable accident and be related to the manner of all past job performance by the employee.

The determination of suspension shall be the concurrence of opinions of a "review committee" consisting of the supervisor, area manager or Corporate Center department head and Manager of Safety, Eastern Group. Should all circumstances be defined as "minor" in nature and cause as determined by the review committee, a suspension for second offense may be waived and a letter of warning issued.

For a THIRD OFFENSE, the Policy states:

In the event of a third such preventable offense, the employee will in all probability be discharged from employment with the Company. A decision to permanently discharge an employee shall require the recommendation of:

a. Area Manger/Corporate Center Department Head
b. Manager of Safety-Eastern Group
c. Vice President-Human Resources
d. Vice President/Affected Area

Prior to 2000, an employee's supervisor was responsible for investigating the circumstances of an accident and making the decision of whether the accident should be deemed preventable. Sometime in late 1999 or early 2000, [Defendant] changed its policy and began employing a third party, Corporate Claims Management ("CCM") to investigate accidents and to make the determination of whether an accident was preventable. An employee's supervisor no longer played a role in making that determination.

The Policy also includes a means by which warnings could be eliminated from an employee's

3

record. It states: "Driving or working three (3) consecutive years without a preventable accident will eliminate one (1) warning." The earliest warning is the one eliminated, making the most current accident the date from which the next three year elimination period begins. Plaintiff admits that during his employment with [Defendant], he had access to the Policy and could look at it whenever he wanted to.

Plaintiff had a preventable accident on February 23, 1994 for which he was issued a written warning on March 2, 1994. Plaintiff had a second preventable accident on March 1, 1994 for which he was given a one-day suspension on March 7, 1994. Plaintiff had a third preventable accident on June 19, 1995. Plaintiff failed to promptly report the June 19, 1995 accident to [Defendant] management and attempted to cover it up by trying to have the vehicle fixed at a private body shop at his own expense. On July 18, 1995, Plaintiff was placed on a five-day suspension as a result of his June 19, 1995 accident and attempted cover-up. All three of these preventable vehicular accidents occurred before Brent Boor became Plaintiff's supervisor and Boor therefore had no involvement in either the investigations or the disciplinary actions taken. Plaintiff had no preventable accidents between July 1995 and July 1998. Therefore, in accordance with the Policy, Plaintiff's first warning of March 2, 1994 was eliminated from his safety record.

Plaintiff's first accident under Boor's supervision occurred in the winter of 1999 when Plaintiff parked his truck on an icy hill. After thoroughly investigating the accident and determining it to have been preventable, Boor decided to use his supervisory discretion and not formally report the accident, in order to give Plaintiff, who already had two preventable accidents on his safety record, a break. Boor felt at the time that if he had reported the accident Plaintiff would have been in danger of being

4

terminated.

On June 19, 2000, Plaintiff had another preventable driving accident, in which he damaged both his truck and a company fence post. Plaintiff was given a five-day suspension on July 17, 2000 and was notified that another accident would result in possible termination. The July 17, 2000 letter to Plaintiff informing him of the discipline for the accident stated, "Please consider this correspondence as a final warning. If you are involved in a preventable accident prior to June 19, 2003 severe disciplinary action will result including immediate termination." Plaintiff understood that if he had another preventable accident after the one on [June19], 2000, he would be fired.[2]

On September 12, 2001, Plaintiff had another driving accident. In this one, he trapped another [Defendant] employee, Robert Layman, between Plaintiff's truck and Layman's company truck. Boor instructed Plaintiff to report the accident through the 800 number used by CCM and also instructed Plaintiff and Layman to each record written statements of the accident. Walter's contemporaneous statement was:

At around 21:30 on 9/12/01 I moved my truck 97622 from New Ped 911/2H-75 (located along 1009 in Hopewell Township). I pulled up behind a truck driven by Robert Layman applying the brake to stop approximately 2 to 3 feet from Bob's truck. Next thing I remember is Bob yelling and seeing him trapped between the trucks. I immediately back up and went to Bob's assistance.

The statement by Robert Layman, the other employee involved in the accident was:

2:30. Along L.R. 1009 Hopewell Township. Had finish maintence [sic] job on H-75 line at Ped 912. Put my tools away on right side of truck and other splice [sic] Dave Walter pull up & stopped behind me approx. 2'. I started to walk between vehicles (behind mine) when Walter's truck drifted forward pinning me between trucks. Walters [sic] was moving truck back right

---

[2]The Defendant incorrectly proposed the date of July 17, 2000; this fact is changed to reflect the correct date of the accident in issue.

5

away.

At his deposition, plaintiff described the accident as follows:

Q.      ...What do you remember happening at the accident?
A.      All I remember is pulling up behind Mr. Layman's truck, stopping. He was off to the right; in other words, I'm facing ahead. He was off to the right of his truck getting stuff and putting it away. And the next thing I remember is hearing him holler and having him pinned between the two trucks.

***

Q.      Did you back you truck up and unpin him as soon as you heard him?
A.      Yes. As soon as I got any mental capacities, yes. I backed up. I mean, I don't-like I said, I don't remember anything other than seeing him off to the right of his truck. And then the next thing I know he's hollering and I look-its like I wake up and there he is between my truck-between our trucks and he's pinned.

CCM deemed the accident "preventable" and forwarded an Automobile Loss Notice to Human Resources. When Plaintiff left work on September 12, 2001, after his accident, he expected to be fired by [Defendant] when he returned to work, because he was on final warning under the Policy.

Once the determination was made that Plaintiff's September 12, 2001 accident was preventable, Jennifer Franklin ("Franklin"), an Employee and Labor Relations Specialist for [Defendant] who had responsibility over the Bedford, PA district (among other workgroups), began the process of deciding what disciplinary action to take against the Plaintiff. Franklin gathered documents and initiated discussions between managers from Human Resources, and Walter's line of Management, and an in-house attorney from [Defendant's] legal group. On September 17, 2001, a decision was reached by those managers to discharge Plaintiff because of his record of vehicular accidents, in light of his final warning status and his third chargeable preventable accident on September 12, 2001. Plaintiff's supervisor, [] Boor, was not involved in Plaintiff's termination decision. There was no discussion

6

during the deliberations over Plaintiff's employment status of any potential disability he may have had. Nor was his age mentioned. If anything, his long service was noted as a factor militating against his discharge.

On September 19, 2001, Franklin and Boor met with Plaintiff and informed him that he was being discharged. In that meeting, Plaintiff confirmed that he had no knowledge at the time of the accident-and by necessary implication [Defendant] had no knowledge at the time the decision to discharge Plaintiff was made–that Plaintiff was suffering from any type of disability. He admitted he had no indication that he could have been suffering from any type of disability or limitation prior to the accident, stating, "if only I'd known then what I know now, I'd never have been driving that truck."

Plaintiff was diagnosed with coronary heart disease and underwent bypass surgery in May 1985. He was out of work for less than six months at the time: between 1986 and his discharge in 2001, he was never out of work again for any significant period of time because of his heart disease. From 1986 through September 12, 2001, according to Plaintiff, he was able to perform the essential elements of his job, which included climbing poles and driving a heavy truck, without a need for any accommodations. According to Plaintiff, climbing poles and driving heavy trucks are two of the "main essential things" a Cable Splicer must be able to do in order to perform his job.

On June 28, 2001, Boor and three of the Cable Splicers he supervised, including Plaintiff, underwent physical examinations to renew their Commercial Drivers' Licenses ([hereinafter] "CDL's"). At his examination, Plaintiff revealed to the Nurse Practitioner/Physician's Assistant who was conducting the exam that he had an appointment for a cardiac catheterization, and this led her to tell him that he would have to be seen by a cardiologist before she could authorize a renewal of his CDL.

7

Plaintiff was not permitted to drive back from the CDL examination and was off work until he brought

in a return-to-work note. Physicians from Altoona Cardiologist Associates-Dr. Jospeh W. Gattuso and

Dr. Ziad Khoury-were providing Plaintiff with his heart care at that period of time. Plaintiff obtained

a return-to-work note from his cardiologists which indicated he could go back to work at his normal job

on July 3, 2001, with "no restrictions." At the time Plaintiff's cardiologist gave him the return-to-work

note, he verbally told Plaintiff that he "should slow down." Plaintiff understood this to mean:

A.  At the time, I was working any overtime, everything. In other words, I was working up to as high as 45 hours a week, if not more. And from what I understood, not to push myself extra, extra hard like I had before.

Q.  Did you ask Mr. Boor to be excused from any overtime after that?
A.  I told him I probably wouldn't be working any.

Q.  Did he ask why?
A.  I told him why, I told him the doctor told me I was supposed to slow down a little if I wanted to live. I mean, its one of those deals that says you can go ahead. He just said to slow down. Its like everything else. Everybody's hectic life, pace, style. Everybody should slow down.

Plaintiff communicated his doctor's advice to Boor in terms of a need to refrain from working overtime

rather than any problem with performing his job or a possible need for an accommodation:

Q.  Right. I take it though at that time you still understood, both from your doctors and what you knew, that you could still do your job?
A.  Right.

Q.  You just had to do it in 40 hours?
A.  Right.

Q.  Okay. Do you recall between then and the accident having any further discussions with your doctors about how well you do your job, anything like that?
A.  No.

Plaintiff and his supervisor both understood that Plaintiff was fully able to perform his job with no need

8

whatsoever for any "accommodations."

As of the time of his accident on September 12, 2001, Plaintiff was unaware that he was suffering from any physical or mental condition that might have affected his ability to perform his job as a Cable Splicer; therefore he had never informed [Defendant] of any such condition and did not believe he needed an accommodation in order to perform his job. Plaintiff never asked anyone at Sprint about the possibility that he could go out on disability at any time prior to his September 12, 2001 accident:

Q.    Did you have-do you remember any discussion with your doctors in which the issue of your going out on disability came up before you had your accident?
A.    No.

Q.    Had you asked Mr. Boor or anybody else at Sprint if you could go out on disability before your accident?
A.    No, because I planned on working until I was either where I could afford to retire with the early retirement or I reached age 60, whichever came first.

Q.    Okay, so you pretty much decided you were going to retire at 60?
A.    Yes.

Q.    At the latest?
A.    Right.

Plaintiff claims to be "blacked out" due to a "mini-stroke at the time of the September 12, 2001 accident." Plaintiff drove himself to the hospital to get checked out after the accident and stopped at another job afterwards "to see what it would entail."

Donald W. Bulger, M.D., of Claysburg Medical Associates, is Plaintiff's family physician. On October 1, 2001, Dr. Bulger prepared a letter, "To whom it may concern," advising that Plaintiff was told not to continue working at his job at [Defendant] as of September 14, 2001 because Dr. Bulger felt

9

it was unsafe for him to climb poles and drive a heavy vehicle. "This determination was made due to his recent case of syncope of unclear cause."

Plaintiff contends that only one [Defendant] employee–his supervisor, [] Boor– discriminated against him on the basis of age. Plaintiff alleges that Boor discriminated against him on the basis of age because Boor "had stated that he could get the same amount of work out of somebody who was a new hire for a lot less money than what they were paying us; in other words, an older employee." Plaintiff admits that Boor said "new hire." He did not say "older employee." Boor did not utter this statement in the context of discussing layoffs or discharge for any Cable Splicer but in the context of "talking about cost effectiveness." Plaintiff alleges that Boor "single[d] out older employees and pick[ed] out things they did wrong, " and would "more or less embarrass" older employees in front of everyone. When asked if he could name any employees other than himself who had suffered age discrimination, Plaintiff answered, "No."

All of the [five][3] employees under Boor's supervision at the time of Plaintiff's discharge were approximately 50 years old. Plaintiff alleges that Boor treated Kenneth Miller [hereinafter "Miller"], the youngest employee, better than everyone else. Plaintiff claims that Miller was given preferential treatment "for splicing fiber optics" and "was getting all the cake jobs...the easy stuff." Boor assigned most of the fiber optic cable splicing jobs to Miller for legitimate non-discriminatory reasons:

I selected Miller to do the fiber optic jobs for three reasons: First, his computer skills were superior to the other Cable Splicers. Since splicing fiber optic cables encompassed work with computers, he was a better choice than any other Cable Splicer. Second, Miller had superior experience working with fiber optic cable compared to the other Cable Splicers. He had actually

[3]This proposed statement originally stated "six" but it is clear from the record that Kenneth Emler, the sixth man, left his employment with the Defendant approximately one year prior to the Plaintiff's termination. See *infra*, p. 12.

10

performed the fiber optic splicing while serving as an assistant to Kenneth Imler. Prior to Mr. Imler's voluntary retirement. Third, Miller was the only employee in my work group who had received formal training from the company on splicing fiber optic cable. As a matter of fact, Miller conducted on-the-job training on splicing fiber optic cables for the other splicers when they were assigned to his assistant. In short, I assigned Miller to do the fiber optic jobs because he had superior skills, training and experience.

During the time Plaintiff was supervised by Boor, Boor also supervised five other employees: Ronald Page, James Eckard, Kenneth Miller, Kenneth Imler and Robert Layman. Ronald Page was born in 1944. He was roughly two years older than Plaintiff. He began his employment with [Defendant] on January 30, 1967. Plaintiff believed Page to be about two years older than himself. From the time Boor transferred to the Bedford facility in 1996 through at least September 19, 2001, Page was not involved in any accidents. James Eckard was born in 1943. He was roughly three years older than Plaintiff. He began his employment with [Defendant] on May 27, 1968. Plaintiff believed Eckard to be two or three years older than himself. From the time Boor transferred to the Bedford facility in 1996 through at least September 19, 2001, Eckard never had any accidents. Kenneth Miller was born in 1951, making him roughly four years younger than Plaintiff. He began his employment with [Defendant] on October 26, 1971, giving him roughly 20 months less company service than Plaintiff. Plaintiff believed Miller to be three or four years younger than himself. From the time Boor transferred to the Bedford facility in 1996 through at least September 19, 2001, Miller was not involved in any accidents. Robert Layman was born in 1949, making him roughly three years younger than Plaintiff. He began his employment with [Defendant] on November 16, 1970, nine months after Plaintiff. Plaintiff believed Layman to be about three years younger than himself. From the time Boor transferred to the Bedford facility in 1996 through September 12, 2001, Layman never had an accident. Kenneth Imler, who was

11

the oldest member of the group and the one with the most seniority, took an early retirement, at the age of 60, about a year before Plaintiff was terminated. From the time Boor transferred to the Bedford facility in 1996 through the date Imler retired, Imler never had any accidents. On September 17, 2001, the date [Defendant] decided to terminate Plaintiff, the ages of the cable splicers at the Bedford facility were: a.) Ron Page: 57 years old; b.) James Eckard: 58 years old; c.) Kenneth Miller: 50 years old; d.) Robert Layman: 51 years old; e.) David Walter: 54 years old.

Plaintiff alleges that another [Defendant] employee, Mark Popelish, had three accidents and was not fired. Boor was not Mark Popelish's supervisor at the time of the alleged accidents. Boor was not responsible for disciplining Mark Popelish for any alleged accidents. Popelish, currently a Customer Service Technician ("CST") in [Defendant's] Bedford District, had his last vehicular accident over 20 years ago. He was involved in three accidents during the late 1970's and early 1980's. His first and second accidents were nearly three years (34 months) apart. He received a written warning after the second accident. Just a few weeks before completing a 3-year accident-free period after his second accident, Popelish had another minor accident, which a company safety board deemed an industrial accident rather than a vehicular accident. He was suspended without pay for three weeks.

While Plaintiff alleges that Kenneth Miller had 3 accidents within a year's time and was not fired but rather, was given an "inside job" where he was not required to drive he also conceded that he has no personal knowledge of Miller's accidents or any disciplinary measures taken. Kenneth Miller's accidents occurred before Boor became Miller's supervisor. Miller may have had four vehicular accidents in his 34 years of service with [Defendant], but he never had more than two accidents in any three-year period.

12

Plaintiff was not replaced by someone else after he was terminated. Instead the work that he would have done was absorbed by those still working at the Bedford facility or was contracted out to an outside contractor.

On October 15, 2001, Plaintiff signed, under penalty of Pennsylvania's statute on unsworn falsification to authorities, a Non-Job Related Handicap/Disability Questionnaire which he submitted to the Pennsylvania Human Relations Commission. On that Questionnaire, Plaintiff stated that his disability was permanent, that the condition was expected to last the "balance of life" and that he "can't drive" and "can't climb poles." After being discharged by [Defendant], Plaintiff applied for Social Security Disability ([hereinafter] "SSDI") Benefits. As part of that application process, Dr. Donald W. Bulger submitted a Statement of Attending Physician diagnosing Plaintiff as having "Syncope; coronary artery disease," with symptoms first appearing on 9/12/01. Dr. Bulger also stated that Plaintiff was totally disabled both for "his" occupation and for "any" other occupation and that the total disability began on September 12, 2001. In a submission in support of that application, dated December 21, 2001, Plaintiff represented that he could not drive, could not lift heavy objects and could not walk more than 50 feet to 200 yards at a time. On another document Plaintiff completed in support of his SSDI application form SSA-3368BK (12/98) entitled Disability-Report-Adult-form, Walter was asked what illnesses injuries or conditions limit his ability to work. He responded, "heart, mini stroke apnea and sugars." The form also asked how these problems limited his ability to work. He responded that he was "unable to climb or drive work truck."

The Social Security Administration [hereinafter "SSA"] determined that Plaintiff became "disabled," for its purposes, on September 12, 2001 and issued a Notice of Award ([hereinafter]

13

"Award") in response to Plaintiff's application for SSDI benefits, dated January 19, 2002. The Award stated that the SSA had found Plaintiff "became disabled" under its Rule on September 12, 2001, and granted him a monthly benefit of $1,572.00, with payments to start on April 17, 2002 after the statutory five-month period of pre-benefit disability. Plaintiff has continued to receive SSDI benefits to the present.

After his discharge, on November 24, 2001, Plaintiff filed a charge of discrimination with the Pennsylvania Human Relations Commission ([hereinafter] "PHRC") alleging he was discharged "because of his age, 55 and/or [his] record of heart problems." On December 18, 2002, the PHRC wrote Plaintiff's then-lawyer that it had "investigated your [client's] complaint of discrimination and found that the evidence is not sufficient to show an unlawful act of discrimination occurred." It enclosed a copy of its Findings. On February 13, 2003, the PHRC wrote Plaintiff another letter concerning his charge, stating that it had determined, after investigating his claims, that "the complaint should be dismissed because the facts of the case do not establish that probable cause exists to credit the allegations of unlawful discrimination." In its Findings, the PHRC found that Plaintiff "was discharged for having five preventable accidents since 1994, and as a direct result of the [Plaintiff's] repeated disregard of [Defendant's] safety policies." The PHRC rejected Plaintiff's claims of disparate treatment by [Defendant] over his vehicular accidents in comparison to Mark Popelish and Kenneth Miller:

4.2  Mark Popelish, date of birth ____, 1956, has not had a preventable accident in the past 18-20 years.

4.3  Ken Miller, date of birth ____, 1951, has not had a preventable accident in the past 20 years.

As to Plaintiff's claims of disability discrimination, the PHRC found that Plaintiff did not meet the

14

definition of a qualified individual with a disability because Plaintiff's physical impairment-related to

heart surgery in 1985-"does not substantially limit one or more major life activities." noting:

> On July 2, 2001, and following the heart catheterization, the Complainant's cardiologist, Ziad Khoury, M.D. released the Complainant with a note stating "Patient able to return to work with no restrictions."

## II.  Analysis

### A.  Summary Judgment Standards

> "Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91 L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P. 56(c).  An issue of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211-212 (1986).  In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant.  *Oritani [Sav. And Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638]."

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

> "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.  See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983).  This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination.  That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs.  Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## B. ADA and ADEA Standards

The ADA makes it unlawful, *inter alia,* for an employer to discriminate "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In order to advance an ADA discrimination claim, a plaintiff must show that: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer, and (3) she has suffered an otherwise adverse employment decision as a result of discrimination. *Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir.1996). A plaintiff can meet this burden by presenting indirect evidence of discrimination that satisfies the three-step framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800-06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and clarified in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), or a plaintiff can "present direct evidence of discrimination that meets the requirements of Justice O'Connor's controlling opinion in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)". *Fakete v. Aetna, Inc.,* 308 F.3d 335, 337 (3d Cir.2002); *see also Walden v. Saint Gobain Corp.,* 323 F.Supp.2d 637, 644 n. 24 (E.D.Pa.2004).

*Kurten v. Hanger Prosthetic and Orthotics, Inc.,* 402 F.Supp.2d 572, 578-579 (W.D.Pa. 2005)(footnote

omitted).

The ADA defines disability as "(a) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(2).[FN6]

FN6. The Court observes that "[b]ecause the ADA does not define many of the pertinent terms, [the Court is] guided by the Regulations issued by the Equal Employment Opportunity Commission to implement Title I of the Act." *Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 143 n. 4 (3d Cir.1998)(en banc)(citing 42 U.S.C. § 12116 (requiring the EEOC to implement said Regulations))(quoted in *Emory v. AstraZeneca Pharmaceuticals LP,* 401 F.3d 174, 180 n. 4 (3d Cir.2005)).

*Kurten v. Hanger Prosthetic and, Orthotics, Inc.,* 402 F.Supp.2d 572, 581 (W.D.Pa. 2005).

16

The Defendant's first argument is that the Plaintiff's award of SSID benefits from the SSA

based upon his claim of total disability conflicts with his present claims under the ADA and ADEA

such that he is estopped from prosecuting the present claims pursuant to *Cleveland v. Policy Mgmt. Sys.*

*Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). The Supreme Court in *Cleveland* found

that a SSID claim may, but not always, conflict with an ADA claim and that when such a conflict does

exist, the claimant must explain this conflict:

> Nonetheless, in some cases an earlier SSDI claim may turn out genuinely to conflict
> with an ADA claim. Summary judgment for a defendant is appropriate when the
> plaintiff "fails to make a showing sufficient to establish the existence of an element
> essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex*
> *Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An ADA
> plaintiff bears the burden of proving that she is a "qualified individual with a disability"-
> that is, a person "who, with or without reasonable accommodation, can perform the
> essential functions" of her job. 42 U.S.C. § 12111(8). And a plaintiff's sworn assertion
> in an application for disability benefits that she is, for example, "unable to work" will
> appear to negate an essential element of her ADA case-at least if she does not offer a
> sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply
> ignore the apparent contradiction that arises out of the earlier SSDI total disability claim.
> Rather, she must proffer a sufficient explanation.

*Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 805-806, 119 S.Ct. 1597, 1603, 143

L.Ed.2d 966, 976-977(1999). *See also Motley v. New Jersey State Police*, 196 F.3d 160, 164 n. 4 (3d

Cir. 1999) The Court of Appeals for the Third Circuit recognized that the Supreme Court's decision

in *Cleveland* concerned the inconsistency in a party's *legal* contention that he is completely disabled

pursuant to one law but not completely disabled for purposes of a second law. *Motley* at 164. It is this

inconsistency that the Supreme Court concluded could "exist side by side" so long a party explained

why the Court should accept that a legal inconsistency did not exist. *Cleveland* at 802-807, 119 S.Ct.

1597, 1601-1604, 143 L.Ed.2d. 966, 974-977; *see also Motley* at 164-165 (quoting *Cleveland, id.*).

17

However, the Supreme Court did not address those instances where *factual assertions* among separate legal claims were inconsistent and thus left such precedent unchanged. *Id.* On those claims concerning inconsistencies of "purely factual" "statements", a "judicial estoppel analysis" would be employed. *Detz v. Greiner Industries, Inc.*, 346 F.3d 109, 118 (3d Cir. 2003).

The Third Circuit in *Motley* did expand on the *Cleveland* decision by indicating that an attempt to differentiate between an SSDI claim and an ADA claim on the basis that SSDI claims do not account for the possibility of accommodations in an employee's "ability to work" would not suffice to survive summary judgment as this would be true of every comparison between an SSDI claim and an ADA claim and acceptance of such a differentiation would result in summary judgment never being granted. *Motley* at 165, 166. The Supreme Court in *Cleveland* set forth what is necessary for an ADA claimant to survive a summary judgment challenge to inconsistent legal positions taken by the claimant:

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Cleveland* at 807, 119 S.Ct. 1597, 1604, 143 L.Ed.2d. 966, 977 (1999).

The Court of Appeals for the Third Circuit has also concluded that claims made under the Age Discrimination in Employment Act (hereinafter "ADEA") and accompanied by an SSDI claim are subject to the *Cleveland* analysis. *Detz*, 346 F.3d 109, 117 (3d Cir. 2003). The Court of Appeals in *Detz* viewed the *Cleveland* analysis as two parts: 1) taking each situation on a "case-by-case basis", is there a conflict among the Plaintiff's legal "assertions"; and 2) if there is, what is the explanation for

18

the inconsistency? *Detz* at 118.

In reviewing the existence of an inconsistency, the Court looks first to the what a determination of "disability" legally equates to under the Social Security Act. An award of SSDI benefits is based on a finding that "an applicant must be incapable of performing his 'past relevant work,' and he must be found unable to perform any other job existing in significant numbers in the nation's economy." *Detz* at 119 (citations omitted); *see also Cleveland* at 804, 119 S.Ct. at 1602-1603, 143 L.Ed.2d 966, 975.

Under the ADEA, "in order to establish a prima facie case under the ADEA, a plaintiff must show, among other things, that he was 'qualified' for the position he held prior to his termination. *See Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) (en banc). To be 'qualified' a plaintiff must have been 'performing his job at a level that met his employer's legitimate expectations' at the time of his discharge." *Detz v. Greiner Industries, Inc.*, 346 F.3d 109, 119 (3d Cir. 2003). In the absence of direct evidence of age discrimination, the burden shifting analysis of *McDonnell Douglas* also applies to the ADEA claims based upon indirect evidence of age discrimination. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005).

The Plaintiff argues that he was a disabled person under the ADA as he had a physical impairment, *i.e.*, a cardiovascular condition, as of 1985, that he had reported this condition to the Defendant by communicating to his supervisor Boor upon his return to work on July 3, 2001 that he should "slow down." Plaintiff's Brief, pp. 5-6. Thereafter in his brief, the Plaintiff cites to the Code of Federal Regulations for the definition of "substantially limits" and the three factors that are to be considered to determine if one is "substantially limited." *See* 29 C.F.R. § 1630.2(j).

Nevertheless, the Plaintiff fails to explain the inconsistency between his application for SSDI

19

benefits and his current claims pursuant to the ADA and ADEA. The undisputed and material facts in the case *sub judice* reveal that the Plaintiff, although not explicitly stating that he was "totally disabled" or "unable to work", has indicated his condition was the equivalent of such in the information he provided to the PHRC. On the PHRC's "Non-job Related Handicap/Disability Questionnaire" the Plaintiff indicated that because of his disability, he "can't drive" and "can't climb poles" , that he would perform these two job duties "daily" and he indicated that he required a "reasonable accommodation" and that other than these two functions of his job, he would be able to perform all other functions of his job. Appendix, Volume III (Document No. 34), p. 58. However, the Plaintiff also indicated that his condition would continue for the "balance of life", that it was "permanent", that it was "worsening", that his doctor placed him on work restrictions and that he does not "have a physician, health service or rehabilitation clinic that has/will certify that [Plaintiff] can perform the job in question with or without reasonable accommodation." *Id.*, p. 56, 64. The record is also clear that the Plaintiff was awarded SSDI benefits upon a finding of disability from the SSA.

Presently, the Plaintiff claims in his Amended Complaint that the Defendant "knew and was aware that the Plaintiff could conduct all of the essential functions of his job with reasonable accommodations." Amended Complaint (Document No. 2), ¶ 42. It clear that a *prima facie* case under the ADEA requires the Plaintiff to be qualified to perform his job at the time of his termination and that the ADA requires that the Plaintiff be a "qualified individual" under that statute, that being a person who can perform his duties with or without reasonable accommodation. The Plaintiff avers in his Amended Complaint that the Plaintiff was "qualified" pursuant to both the ADA and ADEA. Amended Complaint ¶ ¶ 29, 40. Despite averring legal claims under the ADA and ADEA within his Amended

20

Complaint, the contentions of the Plaintiff as set forth in his application for SSDI benefits are in conflict with such claims and it is the burden of the Plaintiff to explain the inconsistency.[4]

The Plaintiff's brief and other filings in this Court fail to explain or even consider the issue of the Plaintiff's qualification under the ADA and only address the issue of the presence of a "disability" under that act and, furthermore, never address the issue of being "qualified" under the ADEA. The "sufficient explanation" mandated by *Cleveland* is not present. Therefore, summary judgment must be granted for the Defendant on the Plaintiff's ADA and ADEA claims.

Alternatively, the Defendant examines the Plaintiff's claims and alleges that the Plaintiff cannot survive a *McDonnell Douglas* analysis for his ADEA and ADA claims if his legal contentions were found to be consistent. As indicated above, the *McDonnell Douglas* framework provides the analytical process for evaluating claims based upon indirect evidence of discrimination. The first step of the framework requires the plaintiff as the non-moving party to present evidence to establish a *prima facie* case of discrimination; if the plaintiff meets this burden of production establishing "an inference of wrongdoing", the second step consists of the burden of production shifting to the defendant as the movant to rebut this inference with "a legitimate, non-discriminatory or non-retaliatory reason for the action taken." *Kurten v. Hanger Prosthetic and Orthotics, Inc.*, 402 F.Supp.2d 572, 579 (W.D.Pa.

_____

[4]However, the Plaintiff in his deposition indicated that he did not know of any "reasonable accommodation" he needed prior to the accident of September 12, 2001 and that his treating doctors indicated that "no reasonable accommodation" "could have let [him] do the job" and that after his diagnosis of syncope he could not perform his job. Appendix III, p. 26. This is a factual contention that is clearly inconsistent with the Plaintiff's present ADA claim. While this fact discredits the allegations of the Plaintiff's averments found in his ADA claim stated in his Amended Complaint, it also discredits any legal argument that the Plaintiff's award of SSDI benefits and an award for his ADA may simultaneously stand because it is indicative of the fact that the Plaintiff did not have an ADA claim prior to his accident and thereafter when the cause of the accident was known, a reasonable accommodation for his condition was not available that would have permitted his continued employment. Thus this fact helps to discredit the Plaintiff's ADA claim and support summary judgment for the Defendant on this claim.

2005). If the defendant successfully rebuts this inference, step three results in the burden of production shifting back to the plaintiff "who must present evidence of pretext 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons[,] or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Kurten* at 580. (citations omitted).

As to the Plaintiff's ADEA claim, the Defendant concedes that the Plaintiff was within the protected class, *i.e.* over age forty, and that he was "discharged". Defendant's Brief, p. 10. However, the Defendant argues that the Plaintiff cannot establish the third and fourth elements of an ADEA claim: that the Plaintiff was qualified for his "position" at the time of discharge and that "he was replaced by a sufficiently younger person to create an inference of age discrimination." Defendant's Brief, pp. 10-11.

It is clear from the record that being able to drive and climb poles are necessary skills for the Plaintiff's former position of Cable Splicer. Appendix, Volume I, pp. 15-16.[5] The record reveals that the Plaintiff has previously indicated that he could not perform these activities as of September 12, 2001. The Plaintiff has not produced evidence of record that would otherwise indicate that he was qualified for the position for Cable Splicer. Moreover, the Plaintiff fails to even discuss his ADEA claims in his brief. Therefore, the Court can also find that the Plaintiff has failed to produce evidence that the Plaintiff was replaced by a younger individual who was "sufficiently younger to permit an inference of age discrimination" with "sufficiently younger" having been interpreted in this this Circuit as

---

[5]The Court finds that the Defendant's assertion in footnote three of its brief that objective criteria control the description of the job title "Cable Splicer" is correct and will rely upon the description found in the Position Questionnaire for "Cable Splicer."

22

being on average at least seven years or more younger than the Plaintiff. *Bernard v. Bethenergy Mines Inc.,* 837 F.Supp. 714, 716-717 (W.D.Pa. 1993). The youngest cable splicer to remain within the group of cable splicers in the Bedford facility was Kenneth Miller who was 51 years old at the time when the Plaintiff was discharged at age 55. The Defendant indicates that any excessive work not able to be completed by the remaining cable splicers was outsourced to an independent contractor. There is no evidence that this contractor was retained because he had younger employees who would perform the same work. Therefore, the Plaintiff has not presented a *prima facie* claim for a violation fo the ADEA and the *McDonnell Douglas* analysis ends after the first step.[6]

In analyzing the Plaintiff's ADA claim, the Court is presented with two arguments from the Defendant: 1) that the Plaintiff cannot establish a *prima facie* case of discrimination; and 2) that the Plaintiff cannot establish that the Defendant's "legitimate, non-discriminatory reason for discharging [the Plaintiff] was a pretext for disability discrimination." Defendant's Brief, p. 15.

"A plaintiff presents a prima facie case of discrimination under the ADA by demonstrating: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."

*Gaul v. Lucent Technologies, Inc.* 134 F.3d 576, 580 (3d Cir. 1998); *see also Kurten, supra.* The Defendant first attacks the assertion that the Plaintiff is disabled according to the ADA, specifically the plaintiff's reliance on a "coronary heart condition" that originates with heart by-pass surgery sixteen

---

[6]Even if the Plaintiff had presented a *prima facie* claim for violation of the ADEA, the Defendant has proffered a legitimate non-discriminatory reason for his discharge, that is his preventable accident record, for purposes of step two of the *McDonnell Douglas* framework and the Plaintiff for purposes of step three has failed to provide any insight as to why the Defendant's proffered reason should be discredited.

years prior to his termination. Although the Plaintiff's answers to interrogatories paint a picture of a Plaintiff who was supposedly limited in "strenuous activities", such as not being able to walk long distances without stopping, the only information known to the Defendant regarding the Plaintiff's heart condition was history of by-pass surgery sixteen years prior, that he was to have a heart catheterization, and that he eventually returned to work without "restrictions" but was told to "slow down" by his doctor, which the Plaintiff understood as working no overtime. Defendant's Proposed Statements, p. 10. This information, while it may demonstrate a physical impairment, does not demonstrate that the Plaintiff was substantially limited in any major life activity, and thus disabled according to the ADA. *See Matheson v. Virgina Islands Community Bank, Corp.*, 297 F.Supp. 819, 828 (U.S.V.I. 2003)(finding that the inability to work more than forty hours a week does not equate to a substantial limitation recognized as a disability under the ADA) (citing *Duff v. Lobdell-Emery Mfg. Co.,* 926 F.Supp. 799, 807 (N.D.Ind.1996); *Kellogg v. Union Pac. R.R. Co.,* 233 F.3d 1083, 1087 (8th Cir.2000)). Therefore, the failure to establish that the Plaintiff's physical impairment, *i.e.*, cardiovascular condition, rose to the level of substantially limiting a major life activity under the ADA is fatal to his ADA claim. The Plaintiff has also not presented evidence that he had a record of an impairment or was regarded as having an impairment that substantially limits a major life activity, especially after sixteen years of working in the same position following by-pass surgery. As a result the Plaintiff has failed to demonstrate that he was disabled which is required in order to establish a *prima facie* ADA claim.

The Plaintiff has also failed to produce evident to demonstrate that he was terminated because of his disability. The Defendant asserts that it did not learn until after that termination of the Plaintiff

24

that he claimed to be disabled. Defendant's Brief, p. 19. The undisputed facts of record support this contention as it appears neither the Plaintiff nor the Defendant were aware of the Plaintiff's cardiovascular health issue at the time of the September 12, 2001 accident or thereafter through the time of his termination. All that Boor was aware of was that the Plaintiff had to "slow down," no accommodations were ever requested by the Plaintiff and the Plaintiff did not relate to Boor what problems he had revealed to the physician's assistant performing the medical evaluations for CDL certification, but the Plaintiff was eventually permitted to returned to work after obtaining a "doctor's note" permitting return without "restrictions" and his CDL certification. Appendix I, pp. 41-44. An employer must know of the existence of a disability before discrimination based upon that disability can take place. *See Rinehimer v. Cemocolift, Inc.*, 292 F.3d 375, 380-381 (3d Cir. 2002).[7]

Finally, assuming a *prima facie* claim was established, the Defendant argues that the Plaintiff has not demonstrated that the Defendant's purpose for termination of the Plaintiff was in fact pretext. The Plaintiff did not address this argument in his brief, and nothing in the record demonstrates that the Defendant's given reason, the violation of the policy on preventable accidents, was not the true reason for his termination.

For all of these reasons the Defendant's motion will be granted.

An appropriate Order follows.

---

[7]In light of the fact that the Defendant has proven that it did not have knowledge of the Plaintiff's condition, the Court will not address the Defendant's argument based upon *Palmer v. Circuit Court of Cook County, Illinois*, 117 F.3d 351 (7th Cir. 1997) that he "was just not immune from discipline because of the ADA." Defendant's Brief, p. 20. The Court finds that the severity of the violent threats in *Palmer* are distinguishable from the hazards the Plaintiff may have created in the Defendant's workplace as well as the fact that the previous accidents of the Plaintiff have not been linked to the Plaintiff's condition, unlike Palmer's delusional (paranoid) disorder.

**AND NOW**, this 6th day of November 2006, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion for Summary Judgment (Document No. 36) is GRANTED and the Clerk of Court shall mark this matter closed.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

26